JUDGE COTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 18 CV 7514

ARTHUR BUDOVSKY,

           DEFENDANT-MOVANT,

    V.

UNITED STATES OF AMERICA,

           RESPONDENT.

13 CR. 368 (DLC)

CIV. NO. _____

---

**Memorandum of Law in Support of Arthur Budovsky's Motion to Vacate
His Conviction and Sentence Pursuant to 28 U.S.C. § 2255**

---

MARSHALL A. MINTZ

MINTZ & OPPENHEIM LLP
260 Madison Avenue, 18th Floor
New York, New York 10016
212-447-1800
MMintz@Minopp.com

*Attorneys for Arthur Budovsky*

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................. i

TABLE OF AUTHORITIES........................................... iii

INTRODUCTION...................................................... 1

STATEMENT OF JURISDICTION................................... 2

STATEMENT OF THE CASE........................................ 3

ARGUMENT

I.      Counsel's Lack of Preparation and Incorrect Advice Was Constitutionally
        Ineffective Assistance, and Mr. Budovsky Could Not Have Made a
        Knowing and Voluntary Decision to Plead Guilty.................... 10

        A.      Ineffective Assistance of Counsel in the Context of Guilty Pleas.... 10

        B.      Discussion......................................................... 12

                1.      The Failure to Be Prepared Was Objectively Unreasonable. . 12

                2.      The Decision to Plead Guilty Was Not Knowing and
                        Voluntary................................................. 16

II.     The Decision Not to Adjourn the Trial Forced Mr. Budovsky to Proceed
        Without the Effective Assistance of Counsel, and Violated His Sixth
        Amendment Rights............................................... 19

        A.      Standard for Reviewing a Decision Denying a Continuance........ 19

        B.      Discussion......................................................... 20

                1.      The Decision Rested on Unfair Characterizations of the
                        Facts...................................................... 20

                2.      The Particular Facts of this Case Made the Trial Schedule
                        Unreasonable............................................. 22

                3.      The Court Gave Insufficient Deference to the Judgment of
                        the Defense Team When Finding That the Sixth
                        Amendment Was and Would Be Satisfied................. 24

III.   There Was a Constructive Denial of Counsel ... . . . . . . . . . . . . . . . . . . . . . . . .  26

IV.   Mr. Budovsky Was Denied the Effective Assistance of Appellate Counsel. .  27

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

# TABLE OF AUTHORITIES

## Cases

*Anders v. California*, 386 U.S. 738 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9

*Barefoot v. Estelle*, 463 U.S. 880 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Baty v. Balkcom*, 661 F.2d 391 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . 12

*Boria v. Keane*, 99 F.3d 492 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Clay v. United States*, 537 U.S. 522 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Cuyler v. Sullivan*, 446 U.S. 335 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Greiner v. Wells*, 417 F.3d 305 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hill v. Lockhart*, 474 U.S. 52 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 16

*Kimmelman v. Morrison*, 477 U.S. 365 (1986). . . . . . . . . . . . . . . . . . . . . 10, 12, 24

*Lafler v. Cooper*, 566 U.S. 156 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

*Lee v. United States*, 137 S. Ct. 1958 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*McMann v. Richardson*, 397 U.S. 759 (1970). . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Morris v. Slappy*, 461 U.S. 1 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Nunes v. Mueller*, 350 F.3d 1045 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . 18

*Puckett v. United States*, 556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . . . . 28

*Roe v. Flores-Ortega*, 528 U.S. 470 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Smith v. Robbins*, 528 U.S. 259 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . 10-12, 24, 26-27

*Ungar v. Sarafite*, 376 U.S. 575 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*United States v. Budovsky*, 2016 WL 386133 (S.D.N.Y. Jan. 28, 2016). . . . . . *passim*

*United States v. Buissereth*, 638 F.3d 114 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . 28

*United States v. Burton*, 584 F.2d 485 (D.C. Cir. 1978). . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Carmichael*, 216 F.3d 224 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . 29

*United States v. Coffin*, 76 F.3d 494 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Cronic*, 466 U.S. 648 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*United States v. Delgado-Marrero*, 744 F.3d 167 (1st Cir. 2014). . . . . . . . . . . . . . . 20

*United States v. Frady*, 456 U.S. 152 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Lee*, 653 F.3d 170 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Mitchell, III*, 354 F.2d 767 (2d Cir. 1966). . . . . . . . . . . . . . . . . . . . 19

*United States v. Moore*, 599 F.2d 310 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Morton*, 412 F.3d 901 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 28

*Von Moltke v. Gillies*, 332 U.S. 708 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## Statutes

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1956(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1960. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

28 U.S.C. § 2255(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2255(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2255(f)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

## Rules

Fed. R. Evid. 1006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

U.S. Sup. Ct. R. 13(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

## Sentencing Guidelines

U.S.S.G. § 3E1.1(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 28

## INTRODUCTION

This Memorandum of Law is submitted in support of Arthur Budovsky's motion, made pursuant to 28 U.S.C. § 2255, to vacate the conviction and sentence in this case.

As explained below, the defense team's failure to be prepared for trial was unreasonable and rendered them incapable of giving Mr. Budovsky informed advice to aid him in his decision of whether or not to plead guilty. In addition, the Court's refusal to adjourn the trial so that the defense team could complete its preparations further diminished Mr. Budovsky's right to counsel. As a result, the guilty plea was not knowing or voluntary because it was the product of an actual or constructive denial of counsel.

Mr. Budovsky was also denied the effective assistance of appellate counsel, who failed to recognize non-frivolous issues about whether the plea was involuntary and/or the government breached the plea agreement, and instead moved to be relieved pursuant to *Anders v. California*, 386 U.S. 738 (1967).

For all those reasons, the Court should vacate the conviction and sentence and order a new trial or permit Mr. Budovsky to re-file his direct appeal so that he can seek appellate review with the benefit of counsel.

1

## STATEMENT OF JURISDICTION

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, motions under 28 U.S.C. § 2255 are subject to a one-year statute of limitations. That limitations period runs from the latest of:

(1)     the date on which the judgment of conviction becomes final;

(2)     the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3)     the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)     the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

For purposes of § 2255(f)(1), a judgment of conviction becomes final when the United States Supreme Court affirms a conviction on the merits, denies a petition for a writ of certiorari, or, when no such petition is sought, the time for doing so expires. *Clay v. United States*, 537 U.S. 522 (2003).

Mr. Budovsky's conviction was affirmed by the Second Circuit in a Summary Order dated May 23, 2017. 2d Cir. Doc. 71.[1] He sought no further review and,

---

[1]     "Doc." refers to the ECF document number in *United States v. Budovsky*, 13 Cr. 368 (DCL). Documents filed under seal are identified as such. "2d Cir. Doc." refers to the ECF document number in *United States v. Budovsky*, No. 16-1564-cr, in the Second Circuit Court of Appeals.

therefore, the statute of limitations began to run on August 21, 2017 – the last day a timely petition for certiorari could have been filed. *See* U.S. Sup. Ct. R. 13(1) (petition timely when filed within 90 days after entry of judgment). As such, this motion is timely under § 2255(f)(1).

Because Mr. Budovsky is currently incarcerated pursuant to 240-month sentence imposed in this case, he also meets the custody requirement of § 2255(a).

## STATEMENT OF THE CASE

### Background

On May 20, 2013, Arthur Budovsky was charged in Superseding Indictment S1 13 Cr. 368 (DLC) with: conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) [Count One]; conspiracy to operate an unlicensed money transmission business in violation of 18 U.S.C. § 371 [Count Two]; and operation of an unlicensed money transmission business in violation of 18 U.S.C. § 1960 [Count Three]. 5/20/13 Indictment (Doc. 18).

Those charges all concerned Mr. Budovsky's involvement in Liberty Reserve, S.A. Liberty Reserve was created by Mr. Budovsky and co-defendant Vladimir Kats in or about 2002 in Brooklyn and eventually moved to Costa Rica in about 2009. By the time it was shut down in May 2013, Liberty Reserve had become one of the world's largest and most used digital currencies. There were more than 5.5 million user accounts and Liberty Reserve had processed over 78 million transactions with a combined value of more than $8 billion. United States users accounted for the largest segment of Liberty Reserve's total transactional volume (between $1 billion and $1.8

3

billion) and the largest number of user accounts (over 600,000).

## Pretrial Proceedings

Arthur Budovsky was arrested in Spain on May 24, 2013, and extradited to the United States in October 2014. He was arraigned in the Southern District of New York on October 14, 2014, and remanded. 10/14/14 Order of Detention (Doc. 97). The government explained that it would be turning over 52 terabytes of discovery, an amount characterized as "extraordinary." 11/13/14 Tr. at 6 (Doc. 107).[2] It also noted that significant parts of the discovery were in Russian and Spanish and had not yet been translated. 11/13/14 Tr. at 7 (Doc. 107). Defense counsel explained that the volume of discovery made it "impossible to say" what a reasonable trial date would be, but the Court scheduled the case for trial on September 21, 2015, and stated that the date was "firm. It will not move." *Id.* at 8-9.

In November 2014 Mr. Budovsky's counsel was relieved and Jeffery Pittell was appointed and stated that he would be available for a September 2015 trial. In January 2015 John Kaley was added as additional counsel for Mr. Budovsky.[3] A defense request to have a technology consultant was granted because there was approximately 64 terabytes of discovery in "multiple file formats" requiring "multiple programs to search and review it." 1/19/15 Letter at 1 (Doc. 132). Further, the trial was adjourned to

---

[2]    A terabyte of data "represents the equivalent of 500 billion typewritten pages of plain text." Manual for Complex Litigation, Fourth, § 11.446 (discovery of computerized data), available at https://www.fjc.gov/sites/default/files/2012/mcl4.pdf (Last checked August 2, 2018).

[3]    To avoid confusion, unless identifying a specific attorney is necessary, the various defense attorneys in the district court are referred to as "defense counsel," "trial counsel," or "the defense team."

November 2, 2015. 1/30/15 Tr. at 10 (Doc. 148).

In April 2015 the government told the defense it would need a forensic expert to search the transactional data, and gave the defense some basic instructions on how to locate, extract, and use specific files in the database. *United States v. Budovsky*, 2016 WL 386133, at *3 (S.D.N.Y. Jan. 28, 2016). In May, the defense was authorized to retain the Catalyst firm to "organize, store, and host the electronic discovery. Among other things, Catalyst would use software to convert the data produced as forensic images of computer hard drives to a format that can be searched through keyword searches." *Id.* at *4.

By August the defense team still did not have a working database, but thought it would only be another "five to seven weeks" for that to get done. 8/14/14 Tr. at 8 (Doc 185). The Court adjourned the trial until February 1, 2016, "for the sole reason that Catalyst had not yet completed uploading the discovery to its database and the defense needed more time to review the data." *Budovsky*, 2016 WL 386133, at *4. Catalyst completed uploading the searchable database in late August, and by September 2015 the defense team included: four attorneys representing Mr. Budovsky, a fifth attorney working as a technology consultant, a sixth attorney working as associate counsel performing various legal work for the team, an investigator, and a paralegal. *Id.*

In November the defense sought an adjournment of the trial date to September 2016 because of the complexities of reviewing the discovery and the recent realization that Catalyst had not entered certain discovery (the transactional data) into the searchable database. The government opposed, and the Court denied the request –

5

noting that if there was "any doubt" that counsel would not be ready for a February 1 trial, the adjournment would have been granted. *Budovsky*, 2016 WL 386133, at *5.

In December the defense again sought an adjournment of the trial date because it had only gained access to the transactional data earlier in the month, some "views" of the data were "locked" (which the defense had described as "encrypted" in an earlier filing), and because it did not have the "underlying data" which made up the Google Analytics reports. 12/24/15 Letter at 1, 4 (Doc. 218). The government opposed any adjournment, explaining that the "locked" data the defense was referring to was lines of computer code which was not accessible to the government either but could still be executed to run to the queries they were written to perform. 12/28/15 Letter at 1 (Doc. 221). The government also explained that the defense's argument about the Google Analytics reports "appears to rest on a misunderstanding. The reports contained in these exhibits *are* the relevant Google Analytics data." *Id.* at 3. The Court declined to adjourn the trial, finding that the defense would be able to run the Google Analytics searches it wanted to in the time that it had, and the arguments about the "locked views" was a "red herring." 12/29/15 Tr. at 31-32 (Doc. 285).

In mid-January the defense sought an adjournment of the trial to May 1, describing the "impossible task of being ready for trial in this case on February 1st." 1/13/16 Letter at 2 (Doc. 257). During the final pretrial conference on January 15, the defense could not easily estimate how long its case would be, because they were still trying to determine what was in the transactional data that "might be helpful to the defense." 1/15/16 Tr. at 30 (Doc. 298). The Court again declined to adjourn the trial. *Id.*

at 133.

### Plea Negotiations and the Guilty Plea

Mr. Budovsky pleaded guilty pursuant to an agreement which provided for a statutory maximum sentence of 20 years' imprisonment. However, there was a significant disagreement about whether the government had initially offered a deal which would have included a 15-year maximum.

At the final pretrial conference, AUSA Turner said that "the government proposed a plea offer in general terms, and it was rejected . . . It would have been to charges that carried a total of 15 year[s] maximum." 1/15/16 Tr. at 26 (Doc. 298). But at an April 6 conference, a different AUSA said there had never been a formal offer of the sort, explaining: "There was nothing reduced to writing. There was [sic] no documents handed over to defense counsel that outlined proposed guidelines ranges, things of that nature." 4/6/16 Tr. at 11 (Doc. 335).[4] Instead, the AUSA described only "discussions about how a 15-year max might be achieved if there were interests by the defendant and defense counsel in resolving the case in that way but no formally [sic] offer, just discussions. Those discussions were left on the table." *Id.* at 12-13.

Defense counsel believed there had been a formal offer, because there had been "continuing discussions" between November and January about "a 15-year cap" and they "were never told that the 15 years was off the table." However, once the defense informed the government that the offer was acceptable to Mr. Budovsky, they were told it "couldn't happen." *Id.* at 14-15.

---

[4]     AUSA Turner was not present at the April 6 conference.

In the end, the Court concluded that "there was no formal offer made by the government to accept a plea at any time to a series of charges that had a 15-year maximum." *Id.* at 32.

## Sentencing

In early February, the defense informed the Court that it believed an expert would be needed right up to the date of sentencing. Counsel explained that: (1) they were still searching the Catalyst database and discovering mitigation information, and believed they would find more information as it continued to search the database; (2) they had only conducted a "cursory review" of the transactional data but believed a significant part of the Liberty Reserve transactions were unrelated to criminal activity; and, (3) the assistance was still needed to "review, research, digest and educate counsel" on the contents and meaning of transactional data. 2/11/16 Letter (Doc. 322) (sealed). At an *ex parte* conference on February 18, 2016, counsel again stated that "it was [defense counsel's] position that we did not have sufficient time to look at everything we wanted to." 2/18/16 Tr. at 10.[5]

The parties appeared for sentencing on May 6, 2016. The Court found that because Mr. Budovsky pleaded guilty on the Friday before a Monday trial, he was not entitled to a reduction under U.S.S.G. § 3E1.1(b) – even though the plea agreement and PSR stated that he was. Notably, the government did not dispute that finding and never actually made a formal motion for the reduction.

---

[5]    That transcript was ordered to be unsealed and docketed but no ECF entry for it appears.

The Court then sentenced Mr. Budovsky to 240 months' imprisonment to be followed by 3 years of supervised release, imposed a fine of $500,000, and ordered forfeiture in the amount of $122 million. 5/9/16 Judgment (Doc. 364).

### The Direct Appeal

Trial counsel was relieved and Jeremy Gutman ("appellate counsel") was appointed to perfect Mr. Budovsky's appeal. Appellate counsel moved to withdraw, pursuant to *Anders v. California*, 386 U.S. 738 (1967), based on a belief that no non-frivolous issues existed for appeal. 9/30/16 Brief (2d Cir. Doc. 28). In appellate counsel's brief he stated, without any elaboration, that there was no indication the government had breached the plea agreement, *id.* at 15, and that Mr. Budovsky had waived any appeal of the denial of a continuance by entering a guilty plea, *id.* at 18.

On October 5, 2016, Mr. Budovsky filed a motion requesting that new counsel be appointed because he did not believe appellate counsel had been thorough with his appeal (2d Cir. Doc. 42-1) and on October 15 appellate counsel filed a motion requesting that new counsel be appointed if the *Anders* motion was granted (2d Cir. Doc. 43-2). That motion was referred to the panel that would determine the *Anders* motion.

Seven months later, the Second Circuit granted the government's motion for summary affirmance and counsel's *Anders* motion, and denied as moot the motion for new counsel to be appointed. 5/23/17 Orders (2d Cir. Docs. 71, 76).

## ARGUMENT

I. **Counsel's Lack of Preparation and Incorrect Advice Was Constitutionally Ineffective Assistance, and Mr. Budovsky Could Not Have Made a Knowing and Voluntary Decision to Plead Guilty**

A. **Ineffective Assistance of Counsel in the Context of Guilty Pleas**

The Sixth Amendment right to the assistance of counsel is the right to the "effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984), *quoting McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970). That right extends to all critical stages of a criminal proceeding, including plea negotiations. *See Lafler v. Cooper*, 566 U.S. 156 (2012). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).[6]

*Strickland* announced the now-familiar two-part test for determining whether an attorney's performance is constitutionally adequate. To establish an ineffective assistance of counsel claim, a petitioner must show that (1) the attorney's performance "fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.

"In the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence." *Hill v.*

---

[6]    In this circumstance it would be the process that was unfair and the result that is suspect.

10

*Lockhart*, 474 U.S. 52, 58 (1985). Judicial review of counsel's performance must be "highly deferential," and counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689, 690. Nonetheless, a guilty plea is "open to attack on the ground that counsel did not provide the defendant with 'reasonably competent advice.'" *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980), *quoting McMann v. Richardson*, 397 U.S. 759, 770-71 (1970).

To satisfy the *Strickland* prejudice requirement, a movant must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. This requires a fact-intensive inquiry specific to the context of the case, which should focus on the particular petitioner's decision-making process. *See Lee v. United States*, 137 S. Ct. 1958 (2017). "[W]e do not ask whether, had he gone to trial, the result of that trial 'would have been different' than the result of the plea bargain. That is because, while we ordinarily 'apply a strong presumption of reliability to judicial proceedings,' 'we cannot accord' any such presumption 'to judicial proceedings that never took place.'" *Id.* at 1965, *quoting Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

Finally, the Supreme Court has declined to adopt a *per se* rule "that a defendant with no viable defense cannot show prejudice from the denial of his right to trial," because the proper focus of the inquiry is "on a defendant's decisionmaking, which may not turn solely on the likelihood of conviction after trial." *Lee*, 137 S. Ct. at 1966.

11

B.    Discussion

1.    **The Failure to Be Prepared Was Objectively Unreasonable**

The function of defense counsel "is to make the adversarial testing process work in the particular case," and includes the "duty to make reasonable investigations." *Strickland*, 466 U.S. at 691. "Inadequate preparation of counsel is one ground for finding a violation of the Sixth Amendment right to effective counsel." *Baty v. Balkcom*, 661 F.2d 391, 394 (5th Cir. 1981). As the Supreme Court has stated, "lack of pretrial preparation puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution, and the reliability of the adversarial testing process." *Kimmelman*, 477 U.S. at 385 (internal quotation marks and citations omitted). Here, the defense team failed at every stage of the process to understand the evidence and be ready for the scheduled trial date.

The indictment in this case was filed in 2013 and, in a 14-paragraph "overview" section that spans 10 pages, describes: how Liberty Reserve was created, structured, and operated; the types of criminal activities Liberty Reserve facilitated; and, the steps Liberty Reserve took to allow its users to conceal their identities. 5/20/13 Indictment at 4-14 (Doc. 18). The following month, the government filed its sentencing memorandum relating to a co-defendant (the Marmilev Memorandum), which gave more information about how Liberty Reserve worked and the ways users would set up accounts with Liberty Reserve. 12/9/14 Memorandum at 3-6 (Doc. 120). The government also described criminal uses of Liberty Reserve, such as "featured merchants" which allowed Liberty Reserve to act as middle-man so users could

12

purchase goods from vendors without being identified, and other merchants that offered offshore banking services and identity documents. *Id.* at 7. The Memorandum also identified specific "carding" websites, offshore gambling websites, and unregulated foreign exchange-trading platforms which referred traffic to Liberty Reserve. *Id.* at 8. In addition, the Memorandum analyzed the "top approximately 500" Liberty Reserve accounts which the government alleged were associated with Ponzi schemes and other illegal activities. *Id.* at 10.

The government provided the bulk of the discovery in January 2015. But it wasn't until *November* that the defense team (which at that point had six attorneys, an investigator, and a paralegal in addition to the Catalyst firm) realized that they "need[ed] a team of translators working full-time" to address those parts of the discovery which were not in English, 11/12/15 Letter at 3 (Doc. 197), even though a full year earlier the government stated at a status conference that significant parts of the discovery were in Russian or Spanish and had not yet been translated. 11/13/14 Tr. at 7 (Doc. 107). At the same time, the defense team also discovered that "the transactional data had not been, and could not be, uploaded onto the Catalyst platform." 11/12/15 Letter at 3, 4 (Doc. 197).

At a hearing to discuss those issues, trial counsel explained that they had "wildly underestimated" their ability to use Catalyst and had simply failed to understand what was being done (or not being done) with the transactional data. 11/16/15 Tr. at 4, 8 (Doc. 209). But the government described those problems as appearing to be "of the defense team's own making," because the government had

"given specific instructions to defense counsel back in April 2015 where the transactional data was located and how to extract it. 11/13/15 Letter at 1, 2 (Doc. 199).

Just one month before the trial was to start, the defense indicated total lack of understanding about what Google Analytics was, claiming that the government should have disclosed "the underlying Google Analytics data" so that the defense could "tes[t] or even challeng[e] or confir[m] the government's Google Analytics charts." 12/29/15 Tr. at 7-8 (Doc. 298). But as the government stated at the time, the defense's argument "appears to rest on a misunderstanding" of what Google Analytics was, because "[i]t is not possible to view the data underlying these reports in some kind of 'raw' form." 12/28/15 Letter at 3 (Doc. 221). *See also Budovsky*, 2016 WL 386133, at *6 ("[The government's] use of Google Analytics is limited to logging into Liberty Reserve's account and running reports the same way that Liberty Reserve could."). So while it might have been reasonable to for the defense to argue that the reports were inadmissible because they were misleading or confusing, this was not even referenced in the section of the defense's *in limine* motion devoted to Fed. R. Evid. 1006 which had been filed a week before. 12/21/15 Memorandum at 22-25 (Doc. 213).

And this is yet another example of the defense team having no actual grasp of what the discovery was, because those reports had also been disclosed by the government a year earlier. 12/30/15 Letter at 1 (Doc. 223) (letter from government to defense specifying where in the January 2015 production the reports were and which item they were listed as in the index). And the Court itself noted, "the Google Analytics reports were apparent well before January and the document production there,"

because the Marmilev sentencing memorandum was filed in early December 2014, and "there is a section [of that document] that begins talking about the Google Analytics data and how that worked, and some of the reports and information from use of Google Analytics that the government found particularly interesting is described on the following pages." 12/29/15 Tr. at 30 (Doc. 285).

Even more telling is a January 17, 2016, letter where the defense team (again requesting an adjournment of the trial) explained that it only gained usable access to the transactional data the week before. 1/19/16 Letter at 1 (Doc. 261).[7] That letter seems to indicate that the *entire* defense being anticipated would rely on the transactional data – which makes it even more unreasonable for them to have failed to focus on that material sooner.[8] Further, the examinations the defense team wanted to do would take "minimal time to perform and evaluate, have limited probative value, are addressed to issues that could be established through alternative evidence, and/or can be executed in a timely way using just a sample" of the data. *Budovsky*, 2016 WL 386133, at *9.

The defense team's arguments about the "locked views" of the data also show how little they understood about the evidence. At no point could counsel provide a coherent explanation about what it believed could be found in that code, and, at the

---

[7]      This is the redacted version of a letter which had been filed *ex parte* and under seal two days earlier.

[8]      The Court was understandably skeptical, noting: "Perhaps reflecting the significance of the Transactional Data to Budovsky's defense, the defense team did not realize that Catalyst had failed to upload the Transactional Data until two months after Catalyst provided it with the searchable database." *Budovsky*, 2016 WL 386133, at *10 n.28.

final pretrial conference, counsel did not even have a firm understanding of what they meant when they spoke about "locked views." 1/15/16 Tr. at 71-72 (DEFENSE: "Your Honor, the problem that we have, we have communicated as recently as late last night for several hours to try to get an understanding from our experts whether what the government has been saying is in their understanding and what they've been working now with this is correct, and they keep telling us no."); 73 (AUSA: "May I add one comment. I understand this view here is synonymous with query.").[9]

Thus, based on the defense team's statements, it either: lacked the appropriate technical skills to understand how to examine the transactional date or Google Analytics reports, didn't understand what actual relevance the transactional data had to the case, or, some combination of those things. Regardless of what the answer is, the result is that Budovsky's attorneys simply did not have any reasonable grasp of the evidence and could not have been giving him professionally competent advice, even though they had an "adequate opportunity" to do so. *Budovsky*, 2016 WL 386133, at *13.

## 2. The Decision to Plead Guilty Was Not Knowing and Voluntary

"The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill*, 474 U.S. at 52 (internal quotations omitted). If

---

[9]    In a December 24, 2015, letter, the defense explained that it was previously calling the data "encrypted" when it was merely "'locked' and could not be viewed." 12/24/15 Letter at 1 (Doc. 218).

a plea bargain is offered, "a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler*, 566 U.S. at 168. But to be of any assistance at all, counsel's opinions must be *informed* opinions. *See Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948) ("An accused is entitled to rely upon his counsel . . . to offer his informed opinion as to what plea should be entered."); *Boria v. Keane*, 99 F.3d 492, 497 (2d Cir. 1996) (Effective assistance "includes counsel's informed opinion as to what pleas should be entered."). Here, the advice defense counsel gave was uninformed, incorrect, and of absolutely no assistance to Mr. Budovsky at all when he was deciding whether to enter a guilty plea.

For example, trial counsel had repeatedly told Mr. Budovsky (and the Court) that they were not, and would not be, adequately familiar with the evidence to be ready for the scheduled trial. And in a letter submitted to this Court shortly after his plea, Mr. Budovsky explained why he feared going to trial and that he was led to believe it would have been futile. Just a few weeks before, defense counsel had not reviewed the materials Mr. Budovsky had prepared for them based on his review of the discovery, and he had doubts about whether counsel "had any intent to go to trial at all." 3/28/16 Letter at 3 (Doc. 332).

When discussing the plea offer that had been made, counsel told Mr. Budovsky "that they will not go to trial, because they will lose 100% by not being ready and prepared," and he would then "get the maximum of thirty years, because everyone 'hates' me." *Id.* at 3-4. Finally, three days before trial, counsel told Mr. Budovsky: "we *will* lose because we are not ready and not prepared!", and he decided to plead guilty

as a result. *Id.* at 4 (emphasis in original); 8/10/16 Budovsky Declaration at ¶ 7 (Exhibit A). *See United States v. Moore*, 599 F.2d 310, 313 (9th Cir. 1979) ("A plea entered because counsel is unprepared for trial is involuntary.").

In fact, even *after* Mr. Budovsky entered his guilty plea, the defense team had still only conducted a "cursory" review of the transactional data, and wanted continued expert assistance to "review, research, digest and educate counsel" on not only the "contents of the transactional data," but also the "conclusions to be fairly drawn" from it. 2/11/16 Letter at 2 (Doc. 322) (sealed). At a conference to address that request, the Court explicitly noted that some of the ways the defense proposed to use the data were "really at odds or [in tension] at least with some of the admissions" that made up the guilty plea. 2/18/16 Tr. at 13.

But if the defense team was still exploring the merits of what basically amounted to factual defenses to the charges at that point, there is simply no way they were giving Mr. Budovsky informed advice (or effective assistance) when he was deciding whether to enter his guilty plea.

The record is also clear that counsel advised Mr. Budovsky to accept a 15-year plea offer (and he did) which had never actually been made. That was first addressed at the final pretrial conference and then in more detail at the April 6 conference, and was also deficient performance which impacted Mr. Budovsky's decisions. *See* pages 7-8 of this Memorandum; *Nunes v. Mueller*, 350 F.3d 1045, 1052 (9th Cir. 2003) (the failure to accurately communicate a plea offer constitutes ineffective assistance of counsel).

Finally, the defense team also wrongly told Mr. Budovsky he would be able to

18

appeal the decision not to adjourn the trial even if he entered a guilty plea, and he relied on that advice when making his decision on how to proceed. *See* 8/10/16 Budovsky Declaration at ¶¶ 9, 11 (Exhibit A) (Explaining that counsel kept saying there was a "good record for an appeal of the order denying any adjournment of the trial date" and he "would not have entered the guilty plea" if he knew that appeal would be unavailable).[10] And the failure to explain the application of the United States Sentencing Guidelines, *id.* at ¶ 8, was also deficient performance.

For all those reasons, the record establishes that Mr. Budovsky did not receive constitutionally effective assistance from counsel, and his plea is invalid and must be vacated by this Court.

## II.  The Decision Not to Adjourn the Trial Forced Mr. Budovsky to Proceed Without the Effective Assistance of Counsel, and Violated His Sixth Amendment Rights

### A.  Standard for Reviewing a Decision Denying a Continuance

As a general rule, a trial court has "broad discretion" in deciding whether to grant or deny a criminal defendant's request for a continuance. *Morris v. Slappy*, 461 U.S. 1, 11 (1983). Still, a court must not adhere to a "myopic insistence upon expeditiousness" at the expense of a criminal defendant's constitutional rights. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). As the Second Circuit has aptly noted, "the desire for expedition can furnish no justification for the subversion of the Sixth Amendment right to present an effective defense through counsel." *United States v. Mitchell, III*,

---

[10]    This advice was either incorrect, or, as explained in Point IV, appellate counsel was ineffective for not raising it in the direct appeal.

354 F.2d 767, 769 (2d Cir. 1966). *See also United States v. Burton*, 584 F.2d 485, 489

(D.C. Cir. 1978) ("[T]he trial judge may not insist on such expeditiousness that counsel

for the defendant lacks reasonable time to prepare for trial; stripping away the

opportunity to prepare for trial is tantamount to denying altogether the assistance of

counsel for the defense.").

There are no mechanical tests for deciding when a denial of a continuance is so

arbitrary as to violate due process. The answer must be found in the circumstances

present in every case, particularly in the reasons presented to the trial judge at the

time the request is denied. *Ungar*, 373 U.S. at 589. In addition to considering the

reasons contemporarily offered in support of the adjournment, other relevant factors

may also be considered, such as:

> the amount of time needed for preparation compared to the actual time
> available; how diligently the movant used the time available; and
> whether the movant contributed to his or her own predicament; the
> complexity of the case; other available assistance; the probable utility of
> a continuance; the extent of any inconvenience to others (including the
> court, witnesses and the opposing party); and the likelihood of injustice
> or unfair prejudice resulting from the denial of the continuance.

*United States v. Delgado-Marrero*, 744 F.3d 167, 195-96 (1st Cir. 2014) (internal

citations omitted).

B.    **Discussion**

1.    **The Decision Rested on Unfair Characterizations of the
     Facts**

As an initial matter, in denying the request to adjourn the trial, the Court

explained that in January 2015 "defense counsel's request for an adjournment of the

trial from September 21 to November 2 was granted." *Budovsky*, 2016 WL 386133, at

*3. But defense counsel did not actually seek a November 2 start date. Rather, the Court proposed the date so that the trial would be finished "comfortably . . . before Christmas," and because "September 21 is more than enough time for the defendant and his attorney to prepare for trial in this case." 1/30/15 Tr. at 9-10 (Doc. 148).

Next, while addressing any prejudice to the government from adjourning the trial date, the Court described "the last-minute nature of the most recent requests for adjournment." *Budovsky*, 2016 WL 386133, at *11. But again, that was not a fair characterization. The defense's August 2015 request for a May 2016 trial was made 90 days before the then scheduled trial date. 8/3/15 Letter at 3 (Doc. 177) (sealed). And that adjournment was made on the assumption that Mr. Pittell would no longer be able to participate in the case. 8/14/15 Tr. at 3 (Doc. 185).

The subsequent requests (in November, December, and January) were made after the longest-serving attorney was effectively removed from the team and a new attorney (Newman) was added. While those requests were made closer to the February 1 date, they were each made as circumstances developed and reiterated the initial position that the defense could simply not be ready in February. And, in fact, the initial request of the Kaley/Newman team was to move the trial to *September* 2016. 11/12/15 Letter (Doc. 197).

The Court also reasoned that Mr. Budovsky had been "on notice" of the government's theory of the case since the indictment was publicly filed in May of 2013, the Marmilev Memorandum from December 2014 gave insight into the government's "evidentiary theories," and "[a]s of the trial date, Budovsky will have had access to the

21

discovery production in this case for over a year." *Budovsky*, 2016 WL 386133, at *10.

But the attorneys who were expected to represent him at trial were not appointed until January and August of 2015. *Id.* at *3-4. And Catalyst did not provide a searchable database to them until late August 2015, so "the defense did not begin to have real access to the discovery, allowing for training on the Catalyst system, until September 2015." 1/13/16 Letter at 2 (Doc. 257). Nor was Mr. Budovsky ever in contact with any of the technical experts. *See* 8/10/16 Budovsky Declaration at ¶ 2 (Exhibit A).

### 2.    The Particular Facts of this Case Made the Trial Schedule Unreasonable

In the January 28 Order, the Court explained that there was a "public interest for the case to proceed to trial without further delay" and an "independent virtue in setting a firm trial date and enforcing it," because that encourages the parties to "assess the strengths and weaknesses of their case in a timely manner" and "organize their resources and efforts" accordingly. *Budovsky*, 2016 WL 386133, at *10, *11.[11]

Mr. Budovsky first appeared in this case on October 10, 2014, and trial was (eventually) scheduled to start on February 1, 2016 – a span of 479 days. Certainly, that is a substantial and, at first glance, sufficient amount of time for counsel to prepare for a normal trial in this district.[12] But in that span of time, the defense was

---

[11]    At the arraignment, the Court advised Mr. Budovsky that "the September 21 trial date was firm," and when it was adjourned until November 2, "[t]he parties were advised that November 2 was a firm trial date." *Budovsky*, 2016 WL 386133, at *2, *3. Finally, the Court moved the trial to February 1, noting: "It will not move again." 8/14/15 Tr. at 29 (Doc. 185).

[12]    Statistics compiled by the Administrative Office of the United States Courts show that in felony criminal cases in the Southern District of New York, the median time from filing to disposition was 13.1 months in 2016 and 16.2 months in

expected to address more than 66 terabytes of discovery which was not in a searchable form and some of which was in languages other than English.

At roughly the same time, the case of *United States v. Ulbricht*, 14 Cr. 68 (KBF), was being litigated in this courthouse. *Ulbricht* also involved a defendant accused of running a website which utilized e-currency transactions so there was a significant amount of electronic discovery, and at least one prosecutor worked on both matters. That case went from arrest (October 1, 2013) to trial (January 13, 2015) in 469 days, but involved only 1/10th the amount of discovery. *See* 9/30/14 Declaration of Joshua J. Horowitz, filed in *United States v. Ulbricht*, 14 Cr. 68 (KBF) at 3-4 (Doc. 70) (Discovery involved only "three two-terabyte hard drives and several USB drives," which held "several hundred thousand digital files.").[13]

But in addition to the problems presented by the volume and form of the discovery, this case also involved changes in counsel which slowed things down even further. It is difficult to discern from the record just how much assistance Mr. Pittell was offering after August and how much his absence impacted the defense team. But at the August 14 conference Mr. Kaley explicitly noted that Mr. Pittell had been on the case the longest and "there's a lot of knowledge there that [the remaining defense attorneys are] going to want to access." 8/14/15 Tr. at 29 (Doc. 185). So it is clear that

---

2015. *See* http://www.uscourts.gov/file/24036/download (Last checked August 11, 2018). It is not clear whether the date the indictment was filed or the date when Budovsky first appeared would be used for that analysis, bu if it is the date of first appearance, then 479 days was not unusual at all.

[13]     Counsel for Mr. Budovsky is informed by Ulbricht's lead counsel that there was no issue of needing to have discovery translated.

Mr. Kaley felt that was a significant factor at the time.

### 3. The Court Gave Insufficient Deference to the Judgment of the Defense Team When Finding That the Sixth Amendment Was and Would Be Satisfied

When courts examine the performance of counsel, they "must apply a 'heavy measure of deference to counsel's judgments.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005), *quoting Strickland*, 466 U.S. at 691.[14] "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time . . . and the standard of review is highly deferential." *Kimmelman*, 477 U.S. at 381, *citing Strickland*, 466 U.S. at 689. Here, the Court unreasonably dismissed repeated statements from counsel that they were not able to discharge their constitutional obligations.

For example, in November 2015 defense counsel told the Court: "I just don't see any way at all that we can get through this [the discovery] and be ready for a May trial, no less a February trial," that "[w]e have grave concerns among ourselves," and that "February is impossible. And that's why we asked for September." 11/16/16 Tr. at 6, 14-15 (Doc. 209). But the Court dismissed those concerns, explaining that it was "important" for the Court "to have confidence that the defendant will be well represented and well prepared for trial. *And if I had any doubt on that score, I would move the trial date.*" 11/16/16 Tr. at 28 (Doc. 209) (emphasis added). The Court then repeated that it was "confident that [the] experienced, knowledgeable counsel here,

---

[14]    While this will ordinarily mean presuming that counsel acted reasonably, the logic should apply equally to this situation and the Court should give the same amount of deference to counsel's opinion that they *could not* act reasonably.

acting in the defendant's interest, can get this case ready for trial." *Id.* at 32.

In late December, the defense team again stated explicitly that it "cannot provide effective assistance to Mr. Budovsky for a February 1" trial date. 12/24/15 Letter at 5 (Doc. 218). And they expanded on that at the final pretrial conference, stating that Budovsky was "entitled to have us look at [the transactional] data and discuss it with him. We haven't had a chance to do it. We haven't had a chance to look at the government's exhibits, all of them. And we haven't had a chance to discuss that with him either, and he's entitled to that." 1/15/16 Tr. at 132 (Doc. 298). But the Court again dismissed those conclusions, saying that counsel "want now a delay in the trial. And they've always wanted that; this is a renewed request. I think I know the multiple reasons for this request. I don't think Mr. Budovsky wants to go to trial on February 1st." *Id.* at 140.

In sum, at the same time the Court was relying on the experience and knowledge of defense counsel to determine that no adjournment was necessary, it also ignored their conclusion that they could not provide effective assistance to Budovsky in the time allotted – a conclusion based on that same professional experience and knowledge.

Finally, in the January 28 Order the Court also explained: "Given the fact that the discovery contains so many pages and lines of data, no attorney or team of attorneys could meaningfully review all of it even with years to prepare for trial" and "the Government freely admits that it has not reviewed all of the material in this case." *Budovsky*, 2016 WL 386133, at *12. While this is unquestionably an accurate

statement, it raises significant problems about cases of this sort and illustrates why the defense team was right to be concerned about its ability to examine *all* of the discovery. If exculpatory or impeachment evidence exists in a "packet" of the discovery that the government has not reviewed, it will not be found unless the defense uncovers it.

But if the defense is required to limit its investigation to the materials the government identifies as being relevant (and, therefore, which the government has already reviewed), the chance that information useful to the defense will go unnoticed increases dramatically.

## III.    There Was a Constructive Denial of Counsel

In *United States v. Cronic,* 466 U.S. 648 (1984), the Supreme Court recognized the theory of a constructive denial of counsel and fashioned a narrow exception to *Strickland*'s prejudice requirement in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658. *Cronic* applies where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," or in situations when counsel is available but "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-60.

As explained above, trial counsel either: (1) was ineffective because they had sufficient time to prepare but failed to do so or (2) acted reasonably but did not have the time required to provide effective assistance, meaning the decision not to adjourn

the trial violated Mr. Budovsky's right to counsel. Therefore (even though prejudice is established above) relief under *Cronic* is appropriate because the errors in this case combined (in some form) to create exactly the kind of situation where, at a trial, counsel would not have been able to meaningfully test the prosecution's case, and, at the plea, counsel was not able to provide constitutionally effective assistance.

## IV.    Mr. Budovsky Was Denied the Effective Assistance of Appellate Counsel

The *Strickland* standard for ineffective assistance of counsel applies equally to appellate counsel as well as trial counsel. "With a claim that counsel erroneously failed to file a merits brief, it will be easier for a defendant-appellant to satisfy the first part of the *Strickland* test, for it is only necessary for him to show that a reasonably competent attorney would have found one nonfrivolous issue" which would have warranted a merits brief. *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

While "[a] knowing and voluntary guilty plea waives all nonjurisdictional defects in the prior proceedings," *United States v. Coffin*, 76 F.3d 494, 496 (2d Cir. 1996), as explained above the plea here was not voluntary because it was induced by counsel not being prepared and Mr. Budovsky's understanding that he would be able to appeal the decision not to adjourn the trial date even if he entered a guilty plea. *See* 8/10/16 Budovsky Declaration at ¶¶ 8, 11 (Exhibit A).[15] And during the plea allocution, the Court asked Mr. Budovsky whether he understood that "by signing [the plea agreement] you have given up your right to appeal or challenge or litigate *your*

---

[15]    That exhibit is attached to the Declaration of counsel which is filed in support of this motion.

*sentence* so long as I don't sentence you to more than 20 years in prison?", which would not necessarily have given Mr. Budovsky reason to question what he believed. 1/29/16 Tr. at 17-18 (Doc. 311) (emphasis added).[16]

Moreover, because it never claimed that Mr. Budovsky did not sufficiently accept responsibility, the government was required by the plea agreement to make a formal motion under U.S.S.G. § 3E1.1(b) for an additional one-point reduction. By not moving for the third point, the government breached the plea agreement. *See United States v. Lee*, 653 F.3d 170, 173 (2d Cir. 2011) ("[A] government motion is a necessary prerequisite to the granting of the third point."); *United States v. Morton*, 412 F.3d 901, 908 (8th Cir. 2005) ("Because [the defendant] abided by the plea agreement, the government breached the agreement by refusing to move for a one-level reduction pursuant to § 3E1.1(b)"). As such, appellate counsel was incorrect to rely on that waiver to determine that no issues existed for appeal. *See United States v. Buissereth*, 638 F.3d 114, 118 (2d Cir. 2011) (waiver of appellate rights is unenforceable if the government breached the agreement containing the waiver).[17]

Thus, there were certainly non-frivolous arguments available for appeal about whether the decision to deny a continuance rendered the guilty plea infirm and

---

[16]    Earlier in the allocution the Court told Budovsky he would have a right to appeal from a guilty verdict but that by pleading guilty he would "give up your right to a trial and all the other rights I have just described." 1/29/16 Tr. at 9 (Doc 311). However, the Court explicitly addressed only the sentence when discussing the appellate waiver provision of the plea agreement.

[17]    A claim that the government breached the terms of a plea agreement is subject to review for plain error on appeal where no objection was raised in the district court. *See Puckett v. United States*, 556 U.S. 129 (2009).

whether the appellate waiver provision was even enforceable.

And the prejudice of failing to have a counseled appellate brief addressing those issues is not mitigated merely by being able to present a claim for collateral relief, because the burden of proof is much greater in this context. *See United States v. Frady*, 456 U.S. 152, 166 (1982) ("[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal.").[18]

In general, the proper remedy for ineffective assistance of counsel is "one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error." *United States v. Carmichael*, 216 F.3d 224, 227 (2d Cir. 2000). So, were the Court to agree that appellate counsel was ineffective, it could fashion relief that would permit Mr. Budovsky an opportunity to take a new direct appeal so that he could have his claims reviewed by the Second Circuit in the first instance.

Finally, if the Court were to find that review of the decision to deny a continuance was waived by the guilty plea, if trial counsel did not intend it to be waived and because of how significant a factor that denial obviously was to Mr. Budovsky's decision to plead guilty, trial counsel's failure to even request a conditional plea should be considered as an additional basis on which to find ineffective assistance.

---

[18]    One of the reasons for this is that "direct appeal is the primary avenue for review of a conviction and sentence," and "a presumption of finality attaches" at the end of that process. *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).

## CONCLUSION

For all the reasons set forth above, the Court should vacate the conviction and sentence and order a new trial or permit Mr. Budovsky to re-file his direct appeal so that he can seek appellate review of these issues in the first instance.


Dated:      August 16, 2018
            New York, New York


                                    Respectfully submitted,

                                    MARSHALL A. MINTZ

                                    MINTZ & OPPENHEIM LLP
                                    260 Madison Avenue, 18th Floor
                                    New York, New York 10016
                                    212-447-1800

                                    *Attorneys for Arthur Budovsky*